# EXHIBIT

## "1"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **Agilent Technologies, Inc.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| **v.** ) | Case No. _____ |
| ) | |
| **Xpedient Management Group, LLC and St.** ) | |
| **Paul Fire and Marine Insurance Company,** ) | |
| **Defendants** ) | |
| ) | |

## COMPLAINT

Plaintiff Agilent Technologies, Inc. ("Agilent" or "Plaintiff"), by its undersigned counsel, for its complaint against Xpedient Management Group, LLC ("Xpedient") and St. Paul Fire and Marine Insurance Company ("St. Paul" with Xpedient, the "Defendants") hereby alleges the following:

**I.**  **NATURE OF THE ACTION**

1.      This is a complaint for breach of contract, breach of bailment and/or negligent bailment, negligent misrepresentation, negligence and/or reckless acts or omissions, and declaratory relief against Xpedient and negligence against St. Paul. Plaintiff seeks the recovery of damages, litigation costs and expenses, and for any and all other relief to which Plaintiff may be entitled from Defendants.

2.      Defendant Xpedient was engaged by Agilent for one primary job: the storage and care of $12 million of Agilent inventory.

3.      To effectuate this assignment, Xpedient leased from St. Paul a large warehouse space to hold the inventory and then executed a warehousing contract with Agilent for a three-year term.

4.      Months into the warehousing contract, dispatches from news outlets around the country warned of a serious cold weather event that would affect the southern United States. Meanwhile, unbeknownst to Agilent, the warehouse space holding its sensitive inventory had no gas, no heat, and no protection against the impending freeze.  As a state of emergency was declared in Memphis, Defendants—two companies in the warehousing, real estate, and/or insurance industries—neither took action nor warned Agilent of the conditions of the warehouse and the risks they posed to Agilent's inventory.

5.      The weather event arrived as expected—a bitter winter freeze in Memphis and the surrounding region.  The warehouse, unprotected from the cold, was not spared. Pipes burst and the sprinkler system activated, soaking the warehouse from floor to ceiling and the goods stored inside it, and forcing Agilent to dispose of most of its inventory and relocate the remainder at its own expense.

6.      Despite having destroyed the inventory and with it, Agilent's need for warehouse space, Defendants have denied all liability.  Adding to this insult, Xpedient claims that Agilent remains bound to the full term of the warehousing contract and that it owes nothing to Agilent for the lost inventory, monthly fees, relocation expenses, and business interruption to Agilent.

7.      It has been a full year since the loss.  Dutifully, Agilent continues to pay tens of thousands of dollars per month for a warehouse that sits empty.  Xpedient, by contrast, is better off than ever, collecting a check for a job no longer needed due to its own negligence and wrongdoing.

## II.    **PARTIES**

8.      Plaintiff Agilent Technologies, Inc. ("Agilent" or "Plaintiff") is a Delaware corporation with its principal place of business located at 5301 Stevens Creek Blvd., Santa Clara, California 95051.

9.      Upon information and belief, defendant Xpedient Management Group, LLC ("Xpedient" or "XMG") is a Tennessee limited liability company with its principal place of business located at 100 Crescent Court, Suite 700, Dallas, Texas 75201, and may be served through its registered agent, Business Filings, Inc., at 300 Montvue Road, Knoxville, Tennessee 37919.

10.     Upon information and belief, defendant St. Paul Fire and Marine Insurance Company ("St. Paul") is a Connecticut corporation with its principal place of business located at One Tower Square, Hartford, Connecticut 06183, and may be served through its registered agent, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203.

## III.   **JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332, 1367 as Plaintiff is a citizen of Delaware and Defendants are citizens of Tennessee and Connecticut respectively.

12.     The amount in controversy exceeds $75,000 exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendants, and venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, because, among other reasons, a substantial part of the events giving rise to the claims described herein occurred in this judicial district and because Defendants regularly conduct business in this Commonwealth and this District, including owning and/or operating facilities in this District.

## IV.    BACKGROUND

### A.    Agilent Seeks a Warehouser for Surplus Pipette Tips

14.    Agilent is a world-leading supplier in life sciences, diagnostics and applied chemical markets.  Agilent advances quality of life with a broad range of high-quality solutions to customers.

15.    Agilent provides laboratories with instruments, services, consumables, applications, and expertise, enabling customers to achieve their research, production, therapeutic, and discovery goals. Agilent instruments, software, and sample preparation solutions help scientists at top-tier universities conduct faster, more accurate research to learn more about cancer, cardiovascular diseases, diabetes, Alzheimer's, Parkinson's, and other ailments.

16.    Some of Agilent's instruments, particularly those in its Bravo Automated Liquid Handling Platform, contain internal pipettes that measure and transport and dispense liquid samples or specimens to be tested.  These high-precision, liquid-handling pipettes found within the robotic instruments use single- or limited-use, medical-grade disposable plastic tips.  The Bravo instruments are used for high-throughput sample manipulation, meaning that the instruments use a large number of pipette tips (often either 96 or 386 tips per cycle).  The pipette tips are considered "consumable" products typically discarded after a single use.  The pipette tips allow the instruments to be used repeatedly and in a clean manner in the same way that a thermometer cover may be used to keep the thermometer fresh for consecutive users or measurements.

17.    To ensure the accuracy of measurements taken on Agilent's instruments, these pipette tips are manufactured in a tightly controlled environment and are subject to rigorous performance specifications and performance standards.

4

18.     In or around 2023, following a period of irregularity in worldwide supply chains, Agilent acquired a surplus of pipette tips to maintain assurance of supply.  With limited space of its own, Agilent began looking for a logistics company in the Memphis area to provide warehousing for the surplus pipette tips inventory, valued at over $12 million ("Tips Inventory").

**B.      Agilent's Selects Xpedient and The Cromwell Warehouse**

19.     In or around May 2023, Agilent selected Xpedient to provide warehousing for the Tips Inventory.

20.     Xpedient is a third-party logistics company that holds itself out as having "significant expertise in Warehousing" and offering "a finely tuned warehousing operation that delivers beyond expectations."

21.     On its website, Xpedient claims it can "locate the perfect site for your warehouse, design the layout, and set up processes and equipment . . . ."

22.     One such "perfect site" that Xpedient operated was an approximately 45,000-square-foot sub-portion of a warehouse located at 4601 Cromwell Ave, Memphis, Tennessee 38118 ("Cromwell Warehouse").

23.     The Cromwell Warehouse is owned by St. Paul and lies in a large industrial neighborhood of Memphis that spans both sides of the Interstate.

24.     Upon information and belief, at or around the time Xpedient and St. Paul entered into a lease agreement, St. Paul knew or should have known that Xpedient was leasing the Cromwell Warehouse space for Agilent's benefit and for the sole and exclusive purpose of providing warehousing services to Agilent for the Tips Inventory.

C.      **Agilent and Xpedient Enter into Warehousing Agreements**

25.     On or around May 15, 2023, Agilent and Xpedient entered into two agreements: (1) a Master Operating Services Agreement for Logistics Services (the "MOSA") and (2) a Site Operating Agreement ("SOA," and, together with the MOSA, the "Agreements"). Attached hereto as **Exhibit A** is a true and correct copy of the MOSA and attached hereto as **Exhibit B** is a true and correct copy of the SOA, which are both filed under seal herewith because of the confidentiality clause in the MOSA.

26.     Under the MOSA, Xpedient agreed to provide logistics services to Agilent, including warehousing, transportation management, and consulting services, as further specified in the SOA.

27.     The SOA then specified the Cromwell Warehouse as the facility to be used to store the Tips Inventory and contained critical details of Xpedient's obligations, such as "facility management, including rent, utilities [*sic*] interest, tax, maintenance, repairs, and security."

28.     In exchange for these logistics services, Agilent agreed to pay Xpedient in excess of $1 million over the 36-month term of the Agreements.

29.     Upon information and belief, Xpedient knew or should have known that the primary purpose of the Agreements was the safe warehousing of Agilent's Tips Inventory.

30.     On or around May 22, 2023, Agilent began moving the Tips Inventory into the Cromwell Warehouse.

D.      **Defendants Fail to Maintain the Cromwell Warehouse**

31.     What Agilent did not know at the time it moved the Tips Inventory into the Cromwell Warehouse was that the utilities were still to be transferred to Xpedient, that the gas line was locked, and that the HVAC system was not working.

32.     Upon information and belief, the HVAC (heating, ventilation, and air conditioning) system at the Cromwell Warehouse relied on natural gas.  Thus, without a working gas line, the Cromwell Warehouse was unable to generate heat.

33.     A functioning HVAC system in the Memphis area is generally a necessity, in light of the humid, subtropical, climate and four distinct seasons, with drastic swings in temperature from the hot and humid summers to the ice storms and freezing rains of winter.  The ability to maintain temperatures above freezing, via an HVAC system or otherwise, in response to these drops in temperature also was critical in the Cromwell Warehouse, which, upon information and belief, at all relevant times, had a fire suppression wet sprinkler system that was unwrapped and without insulation, and exposed in the ceiling of the building.

34.     On or around May 23, 2023, days *after* execution of the Agreements and *after* certain of the Tips Inventory was placed in the Cromwell Warehouse, Xpedient contacted St. Paul, through its property manager ("Property Manager"), to discuss having the utility accounts associated with its leased sub-portion of the Cromwell Warehouse transferred to Xpedient.

35.     The Property Manager (a legal agent of St. Paul—authorized to bind St. Paul in all matters related to the Cromwell Warehouse) responded on that same date and advised that an account with Memphis Light, Gas, and Water ("MLGW")—the municipal public utility serving the City of Memphis—would need to be transferred to Xpedient.

36.     Unfortunately for Agilent, such transfer of utility accounts appears to not have occurred for nearly a year following the storage of the Tips Inventory in the Cromwell Warehouse.

37.     Upon information and belief, and based on the following series of communications between St. Paul, Xpedient, and MLGW, it appears that (1) Xpedient was never established as the

account holder for the utilities serving the Cromwell Warehouse and (2) that both the gas line and

HVAC systems were in disrepair:

- **July 6, 2023** (on or around)   St. Paul's Property Manager notified Xpedient that they were going to "separate out the utilities" at the Cromwell Warehouse between the "vacant space" and the "XMG[] side."

- **July 6, 2023** (on or around)   Xpedient advised the Property Manager that MLGW would not talk with Xpedient regarding the MLGW utility account(s) associated with the Cromwell Warehouse.

- **July 7, 2023** (on or around)   St. Paul's Property Manager notified Xpedient that "a lift was going to be delivered so they could get the gas split and meter set." Once completed, the Property Manager alleged "HVAC work could begin" at the Cromwell Warehouse.

- **October 17, 2023** (on or around)   Xpedient received a "cut off" notice from MLGW.

- **October 17, 2023 —**
  **October 25, 2023** (on or around)   MLGW allegedly advised Xpedient, at that time, that the cut off notice was a "mistake" but that the account associated with the Xpedient sub-portion of the Cromwell Warehouse was "in dispute."

- **October 25, 2023** (on or around)   Xpedient received a notification from MLGW advising it that "billing [would] be delayed for further investigation, to ensure accurate billing from MLGW" and that its account was "under review."

38.     Upon information and belief, following these sporadic communications during the

summer and fall of 2023, Xpedient's and/or St. Paul's efforts to have the account transferred, the

gas line unlocked, and HVAC system repaired, were abandoned.

39.     During this period, Agilent was never advised that the gas meter had been locked

since May 2023, and that, as a result, that portion of the Cromwell Warehouse where the Tips

Inventory was stored could not be heated.

40. Upon information and belief, it was not until January 18, 2024, that Xpedient resumed its communications with MLGW.  By this time, the damage had been done.

**E.** **A Deep Freeze Hits Memphis**

41. Beginning in early January of 2024, news outlets nationwide warned of a freeze anticipated throughout the Southwest United States.

42. On or around January 8, 2024, MLGW issued a news release advising its customers (which, upon information and belief, included Defendants at the time) that "severe weather [was] expected this week including high winds, freezing temperatures, and possible snow."

43. In the release, MLGW asked that its "customers prepare their homes and businesses for the extreme cold by protecting water pipes and checking on automated sprinkler systems."

44. MLGW also warned its customers that "water pipes can burst any time temperatures are below freezing" and that "[a] burst water pipe or water heater is considered to be an emergency situation and could pose a danger of flooding the building."

45. MLGW advised that its "Customers should open cabinet doors and turn water to a slow drip to prevent pipes from freezing" and that its "Customers can also wrap pipes either in pipe insulation (available at hardware stores) or with towels, clothes, etc... to prevent pipes from freezing."

46. In the notice, MLGW told its customers that "[i]f your pipes freeze, turn off the main valve . . . and call MLGW's emergency contact number…"

47. MLGW's guidance conforms to the numerous resources available online for protecting or "winterizing" pipes and sprinkler systems during the colder months.  For example, the National Fire Sprinkler Association ("NFSA"), warned, in a 2022 article entitled "How to Winterize A Fire Sprinkler System," that "[l]ack of proper maintenance is one of the leading

reasons for fire sprinkler system failures. . . . Systems exposed to cold weather are especially vulnerable . . . . [and] [d]uring cold months, are more susceptible to catastrophic failure." Accordingly, "[m]aintaining a minimum of 40 degrees (F) is imperative in ensuring the sprinkler pipes do not freeze."

48.     Where a temperature of 40 degrees (F) cannot be maintained, NFSA recommends that sprinkler systems should be "protected with a dry pipe or antifreeze system."  However, such systems "require more thorough assessments and routine maintenance to keep the systems from freezing."  Even then "wet portions of the dry pipe valve must be maintained at a minimum of 40 degrees (F) and the enclosure must be inspected daily to verify minimum temperature is maintained. . ."

49.     In short, NFSA cautions, "[w]hen not properly maintained, fire protection systems can freeze, burst, and fail to function entirely . . . . It is extremely important to ensure that these systems are properly maintained to ensure they are ready to operate in the event of an emergency."

50.     As predicted, beginning on or around January 14, 2024, the temperature in Memphis began to drop below freezing.

51.     On January 15, 2024, the National Weather Service issued both a Winter Storm Warning and Wind Chill Advisory for the Memphis area, cautioning that there was a risk of "dangerously cold wind chills below 0 °F . . . ."

52.     The same day, the Mayor of the City of Memphis, Paul Young, declared a state of emergency (No. 1-2024) relating to "the severe winter weather impacting the City of Memphis," and "resulting in freezing temperatures and several inches of snow accumulation."  The state of emergency was to be in effect for seven days through January 22, 2024, but was extended through January 29, 2024.

**F.    The Deep Freeze Damages the Unheated Cromwell Warehouse, Destroying the Majority of the Tips Inventory**

53.    On or around the evening of January 17, 2024, in the midst of the deep freeze, the Memphis Fire Department received a notification that the sprinkler system at the Cromwell Warehouse had activated due to "malfunction."

54.    The Memphis Fire Department reported to the Cromwell Warehouse where, according to the Fire Department Incident Report, they stayed on site for approximately one hour to address the sprinkler system activation.

55.    On or around January 17, 2024, Xpedient also notified the St. Paul Property Manager that there were "busted [frozen] water pipes" in the Cromwell Warehouse.  (The January 17, 2024 water intrusion event at the Cromwell Warehouse, which is alleged to have included burst, frozen domestic water pipes and the sprinkler system activation, is herein referred to as the "Water Intrusion Event".)

56.    The St. Paul Property Manager directed a third-party company—Security Fire Protection—to respond to and assess the damage at the Cromwell Warehouse from the Water Intrusion Event.  Security Fire Protection allegedly reported to the Property Manager that there was water damage at Cromwell Warehouse caused by the burst, frozen domestic pipes and the sprinkler system activation.

57.    Agilent personnel later responded to the Cromwell Warehouse and reported that many of the boxes storing the tips were saturated with water following the Water Intrusion Event.

58.    As the tips are intended for use with Agilent's highly sensitive instruments and given the importance of the diagnostic test results depending on the same, any contact with water and/or other liquids constitutes a contamination event destroying the tips' integrity.

59.     As explained in a 2018 article entitled "Maintaining Proper Sterile Storage Conditions," in *Infection Control Today*, the introduction of "[m]oisture will allow microorganisms from the air and surfaces to wick through packaging materials…. [and] sterile supplies should never be stored near sources of moisture."

60.     Accordingly, following the Water Intrusion Event, the majority of Agilent's Tips Inventory stored at the Cromwell Warehouse was destroyed from contact with water and/or other liquids from the sprinkler system and/or burst pipes, causing Agilent losses and damages in excess of $9 million.

61.     St. Paul, as the property owner, and Xpedient, as the warehousing service provider, shared responsibility to ensure the Cromwell Warehouse had functioning utilities, such as an HVAC system, sprinkler system, and domestic water pipes.

62.     Both Defendants knew or should have known that, given the lack of heat in the Cromwell Warehouse, the impending deep freeze presented a significant risk of domestic pipe and sprinkler system failure (especially where such pipes, like those allegedly comprising the sprinkler system at the Cromwell Warehouse, were unwrapped and lacking insulation).

**G.     Agilent Suffers Over $9 Million in Damages from the Water Intrusion Event**

63.     On or around January 18, 2024, Agilent learned of the Water Intrusion Event.

64.     Agilent acted immediately to preserve whatever portion of the Tips Inventory might still be saleable or otherwise usable.

65.     Agilent consulted with the third-party manufacture of the Tips Inventory to assess the possibility of salvaging the damaged portion.

66.     After significant investigation and analysis, over $8.5 million worth of tips were found to have been damaged and/or destroyed as a result of the Water Intrusion Event.

67.     In addition to the $8.5 million loss of saleable inventory, Agilent was forced to spend hundreds of thousands of dollars transporting and disposing of the destroyed tips.

68.     In the end, Agilent was forced to devote innumerable personnel hours to addressing the business disruptions caused by the Water Intrusion Event.

**H.     In the Aftermath of the Water Intrusion Event, Months Lapse Before Basic Utilities are Restored to the Cromwell Warehouse**

69.     With a soaking wet warehouse and inability to further hide the lack of gas and functioning HVAC, Defendants resume their efforts to establish the correct account holder with MLGW and hire an HVAC vendor to finally bring heat to the Cromwell Warehouse:

- **January 18, 2024** (on or around)   MLGW advised St. Paul's Property Manager that the gas line affiliated with Xpedient's portion of the Cromwell Warehouse had never been turned on and that a gas inspection would need to be completed prior to the gas line being turned on and the meter unlocked.

- **January 18, 2024** (on or around)   Upon information and belief, St. Paul's Property Manager informed Xpedient of the above communication from MLGW.

- **February 22, 2024** (on or around)   MLGW advised Xpedient that its account associated with the Cromwell Warehouse was under review and that "no bill has ever been released" in connection with it.  (This would have been consistent with MLGW's October 2023 communication to Xpedient.)

- **March 26, 2024** (on or around)   MLGW went to the Cromwell Warehouse to unlock the gas meter but was unable to, due to the regulator "being bad."  (A gas regulator controls and reduces the pressure of natural gas from the supply line to a level that is safe and suitable for use in appliances such as the HVAC system.)

- **April 2, 2024** (on or around)   St. Paul takes responsibility for and has the "bad" regulator fixed.

- **April 10, 2024** (on or around)     MLGW unlocked the gas meter at the Cromwell Warehouse.

- **April 10, 2024** (on or around)     Following MLGW unlocking the gas meter, Xpedient called an HVAC provider to undertake preventative maintenance and to get the HVAC system "up and running."

- **Mid-September 2024** (on or around)     An HVAC assessment was performed at the Cromwell Warehouse.

- **October 15, 2024** (on or around)     An HVAC maintenance contract for the Cromwell Warehouse was approved and signed by St. Paul.

70.     Upon information and belief, St. Paul and/or Xpedient were responsible for and ultimately did repair and/or replace the damaged domestic pipes and sprinkler system at the Cromwell Warehouse following the Water Intrusion Event and otherwise were responsible for repairing and/or remediating damage to the Cromwell Warehouse following the Water Intrusion Event.

71.     To this day, Xpedient has never clearly identified to Agilent when the Cromwell Warehouse was provisioned with working heat, via an HVAC system or otherwise.

I.     **Agilent Seeks Information about the Water Intrusion Event While Defendants Stonewall and Deny Wrongdoing**

72.     On or around February 6, 2024, Agilent sent Xpedient a notice entitled "Agilent Water Damage Notice" ("February Notice"), wherein, among other things, Agilent requested that Xpedient provide an explanation of the cause of the Water Intrusion Event.

73.     In response, Xpedient failed to mention that for almost seven months, the gas meter at the Cromwell Warehouse had been locked, the gas regulator broken, and that, consequently, the HVAC system was unable to produce heat.

74.     Instead, Xpedient's Senior Vice President of Finance obfuscated Xpedient's known role in failing to minimize or prevent the damage, stating, "[a]t this time it appears water lines froze and burst due to drop in temperatures.  Gas lines / meters feeding HVAC unit were not turned on.  Investigation related to reason for gas supply issues are ongoing."

75.     In March 2024, over two months having passed since the Water Intrusion Event, and Agilent still without any clear answers as to the cause of its lost inventory, Agilent wrote to Xpedient and requested a "final report signed by an executive member of Xpedient leadership[,]" to "include a timeline of the events that predate and lead up to the incident, explanation of the incident itself and cause, as well as the response and subsequent actions and steps that have occurred."  Agilent further specified that such report include: "(1) reasons for lack of heat/gas to the building and efforts to enable heat/gas prior to the damage event; (2) whether there was any 'winterization' or preparation of the fire suppression system in the months leading up to the event; (3) what actions were taken to prepare the warehouse in advance of the cold front that came through Memphis over the January 22, 2024 time frame; and (4) the subsequent actions and steps that have occurred to remediate the water damage (including efforts to enable heat/gas to the building)."

76.     Xpedient's response was uninformative and evasive, stating that it "share[d] Agilent's need for answers."  By this point, upon information and belief, Xpedient would have known *for months* that the gas meter was locked, that the HVAC system was inoperable, and the Cromwell Warehouse was thus unable to be heated.

77.     To date, neither the requested report nor a complete timeline of events has ever been provided by Xpedient to Agilent.  Instead, on or around November 26, 2024, Xpedient, through its counsel, provided a summary of alleged communications between Xpedient, MLGW

and/or St. Paul relating to the Cromwell Warehouse and the Water Intrusion Event. This information presented a troubling snapshot of events and has ultimately raised more questions than answers.

78.     Lacking sufficient information to set forth Xpedient's liability for its loss, but seeking to make clear its efforts to follow the terms of the Agreements, Agilent provided yet another notice to Xpedient on or around June 7, 2024.  Having recently completed a provisional assessment of the total inventory loss, Agilent's June 7, 2024 notice (1) placed Xpedient on notice of its potential claim, based on Xpedient's possible role in the loss, (2) preliminarily quantified its loss based on information known at the time (approximately $8 million), and (3) reiterated its continued need for information relating to the Water Intrusion Event.

79.     Shortly thereafter, Agilent similarly notified St. Paul in a July 2024 letter, inviting St. Paul to inspect the damaged and/or destroyed Tips Inventory and advising of its then estimated $8.6 million loss.

80.     In response to these communications, both Xpedient and St. Paul have denied all liability for the Water Intrusion Event—casting blame on each other and accepting none themselves.

81.     On or around September 12, 2024, Xpedient advised Agilent that the Water Intrusion Event "was not a result of any failure of XMG to perform its obligations under [the Agreements]" and, then two months later, alleged that the "repair of the [Cromwell Warehouse] was the responsibility of [St. Paul]."

82.     Likewise, on or around November 27, 2024, St. Paul advised Agilent that it "denies liability in this matter," explaining "XMG controlled the space as the tenant in this portion of the warehouse" and was "required [] to maintain their section."

83. For an entire year, Agilent has undertaken reasonable efforts to resolve its dispute with Xpedient over liability: requesting repair records and the lease agreement between Xpedient and St. Paul; requesting that Xpedient and/or its insurer make an initial payment for Agilent's inventory loss; and requesting that Xpedient and Agilent attend mediation. All efforts have either been rejected or substantively ignored.

84. Agilent has undertaken the same efforts, to no avail, to resolve its dispute with St. Paul.

**J. Defendants Benefit from their Breach and Wrongdoing While Agilent Continues to Perform Its Obligations under the Agreements**

85. As detailed above, Xpedient and/or St. Paul failed to ensure that the gas meter in the Cromwell Warehouse was unlocked, the gas regulator in good repair, and that the HVAC system was in working order and maintaining normal temperatures in the Cromwell Warehouse. These failures by Xpedient and/or St. Paul materially contributed to and/or caused the Water Intrusion Event and Agilent's loss and damages in excess of $9 million.

86. Even worse, as a significant weather event loomed, Xpedient and/or St. Paul failed to take any preventive actions, such as winterizing the domestic pipes and/or sprinkler system, in the Cromwell Warehouse. These failures by Xpedient and/or St. Paul likewise materially contributed to and/or caused the Water Intrusion Event and Agilent's loss and damages in excess of $9 million.

87. In stark contrast, Agilent has performed and continues to perform all material conditions required under the Agreements, including, without limitation, paying all fees, rates, and charges and notifying Xpedient of its claim, except to the extent that such performance has been excused, waived, or prevented by the representations, acts, or omissions of Xpedient.

88.     Agilent's harm, already substantial, grows by the month, as Agilent, regrettably, pays Xpedient tens of thousands of dollars for an empty warehouse as demanded by Xpedient.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against Xpedient)

89.     Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 88 above as though fully set forth herein.

90.     The Agreements constitute valid and enforceable written agreements between Agilent and Xpedient.  Pursuant to the Agreements, Xpedient agreed to provide warehousing, transportation management and inventory management services at the Cromwell Warehouse and was responsible for the management of the Cromwell Warehouse, "including rent, utilities [*sic*] interest, tax, maintenance, repairs, and security."

91.     The Agreements also contain an implied covenant of good faith and fair dealing under which Xpedient should not take any action that would deprive Agilent of the rights and benefits due to Agilent under the Agreements.

92.     Agilent has performed and/or fully satisfied in a timely manner all material conditions required to be performed by it under the Agreements, including, without limitation, paying all rates, fees, and charges owed under the Agreements and providing timely notice of its claim, except to the extent that such performance has been excused, waived, or prevented by the representations, acts, or omissions of Xpedient.

93.     Xpedient breached the Agreements by failing to maintain and repair the Cromwell Warehouse, including, without limitation, ensuring that the gas meter was unlocked, that the HVAC system was working, and that the Tips Inventory would not be vulnerable to adverse weather due to conditions at the Cromwell Warehouse.

94.     Xpedient also breached the Agreements' implied covenant of good faith and fair dealing by engaging in a course of conduct designed to prevent Agilent from rights due under the Agreements.  Xpedient breached this implied covenant by, among other things, failing to timely disclose, both before and after the Water Intrusion Event, that the gas meter was locked, the regulator was broken, the HVAC system was inoperative, and that the domestic pipes and sprinkler system were not adequately protected against colder temperatures, at the Cromwell Warehouse, while continuing to collect all rates, fees, and charges from Agilent under the Agreements and claiming, after the Water Intrusion Event, that it "share[d] Agilent's need for answers" despite Xpedient having known or should have known of the aforementioned conditions.

95.     Xpedient's breaches of good faith and fair dealing were undertaken to protect Xpedient's own pecuniary interests, without regard to its obligations under the Agreements to Agilent.

96.     As a direct and proximate result of Xpedient's breaches, Agilent has been deprived of the benefit of Agreements for which it has paid Xpedient hundreds of thousands of dollars, and has sustained substantial damages in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court, including without limitation, actual damages, consequential damages, out-of-pocket expenses, and other foreseeable economic losses, all in a sum to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF BAILMENT AND/OR NEGLIGENT BAILMENT**
**(Against Xpedient)**

97.     Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 96 above as though fully set forth herein.

98. On or around May 22, 2023, as agreed by Agilent and Xpedient, Agilent began moving the Tips Inventory, which it owned, into the Cromwell Warehouse with Xpedient's express permission and at its direction.

99. Xpedient's agreement to provide warehousing and storage of Agilent's Tips Inventory, defined as bailed property under the Agreements, and its acceptance of the Tips Inventory at its warehouse for such purpose, created and constitutes a bailment under Tennessee law.

100. The Tips Inventory was in good, new, and undamaged condition at the time such inventory was moved into the Cromwell Warehouse.

101. Xpedient cannot return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition because the Tips Inventory was destroyed while in Xpedient's exclusive possession from contact with water and/or other liquids from the sprinkler system and/or burst pipes at the Cromwell Warehouse.

102. Xpedient's inability to return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition is prima facie evidence of Xpedient's negligence as bailee.

103. As a direct and proximate result thereof, Agilent has sustained substantial damages as a result of Xpedient's breach of bailment and/or negligence as bailee in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation
### (Against Xpedient)

104. Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 103 above as though fully set forth herein.

105.     Xpedient was acting in the course of its regular business when it offered to provide warehousing and storage services to Agilent at the Cromwell Warehouse.

106.     Xpedient failed to exercise reasonable care and provided false information in communicating with Agilent regarding its present ability and intention to provide such services and to safeguard Agilent's Tips Inventory in conditions consistent with industry standards.

107.     Xpedient negligently misrepresented that it would provide functioning utilities and regular supervision, maintenance, and care of the facility at all times, and/or that it would inform Agilent immediately if conditions changed in a manner that would endanger the Tips Inventory.

108.     Xpedient had a pecuniary interest in making the above representations to Agilent so that Agilent would engage Xpedient to provide warehousing and storage services.

109.     Agilent reasonably and justifiably relied upon the representations made by Xpedient in selecting Xpedient to provide the services.

110.     As a direct and proximate result thereof, Agilent has sustained substantial damages due to Xpedient's negligent misrepresentations in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

### FOURTH CAUSE OF ACTION
### Negligence and/or Reckless Actions or Omissions
### (Against Xpedient)

111.     Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 110 above as though fully set forth herein.

112.     At all times relevant hereto, Xpedient had a duty to exercise reasonable care and skill in complying with the Agreements and in reasonably and properly storing and protecting the Tips Inventory from damage.

113.    In taking the aforementioned actions and/or omissions, Xpedient breached its duty of care and skill as a warehouse provider, including without limitation, by (1) failing to timely ensure working utilities in its sub-portion of the Cromwell Warehouse, (2) failing to timely unlock the gas meter, (3) failing to timely fix the broken gas regulator, (4) failing to timely fix the inoperative HVAC system—all of which prevented the heating of the Cromwell Warehouse, and, (5) knowing of these conditions, failing to take any preventive measures to winterize the Cromwell Warehouse, including, without limitation, as to the sprinkler system and domestic pipes.

114.    Such actions and omissions were negligent, undertaken with an utter lack of concern for the safety of the Tips Inventory, were reckless and/or demonstrated a reckless disregard for the rights of Agilent that a conscious indifference to the consequences can be implied.

115.    As a direct and proximate result thereof, Agilent has sustained substantial damages due to Xpedient's negligence and/or reckless acts or omissions in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

116.    In addition to the above, Agilent avers that the actions of Xpedient were reckless or grossly negligent and in complete disregard of the duties it owed to Agilent.

**FIFTH CAUSE OF ACTION**
**Declaratory Relief**
**(Against Xpedient)**

117.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 116 above as though fully set forth herein.

118.    There is a justiciable and actual controversy between Agilent and Xpedient as to whether Agilent is obligated to pay any further amounts under the Agreements, including ongoing fees, rates and charges through May 31, 2026, given Xpedient's material breach of the Agreements and tortious conduct, discussed above, and as, following the destruction of most of the Tips

Inventory due to the Water Intrusion Event, the purpose of the Agreements has been completely frustrated and eliminated Agilent's need for Xpedient's services under the Agreements.

119.    A judicial declaration is necessary and appropriate at this time to determine whether Agilent has any ongoing obligations under the Agreements given the complete frustration of the purpose of the Agreements due to the destruction of most of the Tips Inventory as a result of the Water Intrusion Event.

120.    The Court, therefore, should enter an Order determining the rights and obligations of the parties, if any, with respect to Agreements.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against St. Paul)**

121.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 120 above as though fully set forth herein.

122.    At all times relevant hereto, St. Paul, as landowner, owner, and business operator, and/or the agents, servants, workers, employees of the same, owed to Plaintiff a duty to use ordinary and reasonable care in the maintenance of its property, the Cromwell Warehouse, including, but not limited to, ensuring all utility lines and HVAC systems were working and operational, that the domestic pipes and sprinkler systems were in good repair, and, as necessary protected against colder temperatures, and that the Cromwell Warehouse was generally fit for the purposes for which St. Paul held it out for business.

123.    At all times relevant hereto, St. Paul knew or should have known that the Cromwell Warehouse was being used for the benefit of Agilent and the storage of Agilent's Tips Inventory and, upon information and belief, was accepting payment from Xpedient for such purpose, which was to inure to the benefit of Agilent.

124.     St. Paul breached this duty by, at minimum, failing to maintain the Cromwell Warehouse for the benefit of Agilent, and, at all relevant times, St. Paul knew or should have known of the diminished condition of the Cromwell Warehouse, including, without limitation, the locked gas meter, broken gas regulator, inoperative HVAC system, uninsulated domestic pipes and/or sprinkler system, and general state of disrepair, and the impact of the same on Agilent's Tips Inventory.

125.     Each of the above said acts of negligence directly and proximately caused loss and damage to Agilent.

126.     As a direct and proximate result thereof, Agilent has sustained substantial damages due to St. Paul's negligence in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff Agilent Technologies, Inc. prays that:

A.     Proper process be issued and served upon Defendants, requiring it to answer hereto;

B.     This case be tried before a jury;

C.     Judgment be entered in Plaintiff's favor against Defendants for compensatory damages in an amount to be proven at trial, plus any consequential, incidental, and such other damages as which may be proven;

D.     Plaintiff be awarded punitive damages on the fourth claim for relief;

E.     For the fifth claim for relief, a declaratory judgment that Agilent owes no present or continuing obligations under the Agreements, and any obligation by Agilent to pay fees, rates, and/or charges, under the Agreements, to Xpedient is terminated.

F.      Plaintiff be awarded prejudgment and post-judgment interest on such damages at

the maximum rate allowed by the law;

G.      Plaintiff be awarded its reasonable costs and expenses;

H.      The court costs in this cause be assessed against Defendants; and

I.      For any and all other relief to which Plaintiff may be entitled, including, but not

limited to the right to amend this Complaint.


Dated: January 30, 2025

                                        *s/ Douglas F. Halijan*
                                        Douglas F. Halijan (BPR # 16718)
                                        Elena R. Mosby (BPR # 40562)
                                        Burch Porter & Johnson, PLLC
                                        130 North Court Avenue
                                        Memphis, TN 38103
                                        Telephone: 901-524-5000
                                        Facsimile: 901-524-5024
                                        dhalijan@bpjlaw.com
                                        emosby@bpjlaw.com
                                        *Attorneys for Plaintiff*


Of Counsel:
Amber Finch (*pro hac vice application to be submitted*)
Margaret C. McDonald (*pro hac vice application to be submitted*)
Reed Smith LLP
515 South Flower Street
Los Angeles, CA 90071
Telephone: 213-457-8000
Facsimile: 213-457-8080
mcmcdonald@reedsmith.com